# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP; KAPLAN FOX & KILSHEIMER LLP; PRETI FLAHERTY BELIVEAU & PACHIOS LLP; and BRAMLETT LAW OFFICES,<br><br>                    Plaintiff,<br><br>          -against-<br><br>GLASSMAN, EDWARDS, WADE & WYATT, P.C. and AUDET & PARTNERS LLP,<br><br>                    Defendants. | Case No. 08-cv-5751 (JGK)<br><br>**ECF CASE** |

## <u>NOTICE OF MOTION FOR REMAND</u>

**TO:** Defense Counsel

PLEASE TAKE NOTICE that upon the Memorandum of Law in Support and the accompanying Declaration of Paul Kent Bramlett together with its exhibits, pursuant to 28 U.S.C. § 1447(c), Plaintiffs Wolf Haldenstein Adler Freeman & Herz LLP, Kaplan Fox Kilsheimer LLP; Preti Flaherty Beliveau & Pachios LLP, and Bramlett Law Offices shall move this Court for an order remanding this action to the Supreme Court of the State of New York, or such other and further relief as the Court shall deem just and proper, before the Honorable John G. Koeltl, at the Daniel Patrick Moynihan United States Courthouse, 500 Pearl St., Room 1030, New York, NY 10007 at 9:00 a.m. on August 4, 2008, or such other time as the Court shall set.

**Dated:** July 10, 2008

Respectfully Submitted:

WOLF HALDENSTEIN ADLER FREEMAN
& HERZ LLP

By:   /s/ Thomas H. Burt_____
       Thomas H. Burt, Esq.
       Russell S. Miness, Esq.
270 Madison Avenue
New York, NY 10016
(212) 545-4600

515229

KAPLAN FOX & KILSHEIMER LLP

By:  /s/  Richard J. Kilsheimer (with consent)
        Richard J. Kilsheimer, Esq.
850 Third Avenue, 14th Floor
New York, NY 10022


PRETI, FLAHERTY, BELIVEAU & PACHIOS, LLP
By:  /s/  Gregory P. Hansel (with consent)
        Gregory P. Hansel, Esq.
One City Center
P.O. Box 9546
Portland, ME 04112-9546
*Pro Se*


BRAMLETT LAW OFFICES

By:  /s/  Paul Kent Bramlett (with consent)
        Paul Kent Bramlett, Esq.
2400 Crestmoor Road
P. O. Box 150734
Nashville, TN 37215-0734
*Pro Se*

515229

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

WOLF HALDENSTEIN ADLER FREEMAN &
HERZ LLP; KAPLAN FOX & KILSHEIMER LLP;
PRETI FLAHERTY BELIVEAU & PACHIOS
LLP; and BRAMLETT LAW OFFICES,

Plaintiff,

-against-

GLASSMAN, EDWARDS, WADE & WYATT,
P.C. and AUDET & PARTNERS LLP,

Defendants.

Case No. 08-cv-5751 (JGK)

ECF CASE

DECLARATION OF PAUL KENT
BRAMLETT IN SUPPORT OF MOTION
TO REMAND, AND IN OPPOSITION
TO MOTION TO TRANSFER

---

## DECLARATION OF PAUL KENT BRAMLETT
## IN SUPPORT OF PLAINTIFFS'
## MOTION TO REMAND

---

I, **PAUL KENT BRAMLETT,** being first duly sworn, state as follows:

1.  I am a partner in the P. K. Bramlett Law Office, one of the plaintiffs in the above-captioned case. I submit this affidavit in support of Plaintiffs' Motion to Remand this case to the Supreme Court of the State of New York, County of New York. I have personal knowledge of the facts stated below.

2.  I wish to respond to the allegations of the removal papers filed by Defendants (the firms of Wade and Audet), wherein it is alleged that the filing of the lawsuit in New York state court was forum shopping and that my law firm's claims against them are a fraudulent pretense to defeat diversity jurisdiction.

3.  This case before the Court on removal is a dispute over distribution of moneys held in escrow as part of a settlement, much of which is attorney's fees.

1

4.  The fees in dispute and claimed by the firms of Wade and Audet arose out of litigation which originated in United States District Court in Tennessee, then appealed to the Sixth Circuit Court of Appeals,.

5.  The case over which this dispute has arisen was settled while pending at the Sixth Circuit and the settlement was a private settlement on behalf of the clients represented by Plaintiffs in the instant case. At no time were Wade and Audet representing private clients of their own nor was the settlement reached on behalf of the putative class.

6.  I was originally retained by the law firm of Wolf Haldenstein in September 2004 to serve as local counsel for their firm and their clients in putative class action cases involving the copper industry.

7.  As a part of my duties in the cases, I was one of the attorneys filing the second round of Copper cases, filing the case of *PoolPak Technologies Corp. v. Outokumtu, et al,* Case No. 2:06-cv-2207-BBD-tmp, which case later was consolidated with other similar cases and all the litigation was then to be known as the "*ACR Litigation*". The docket sheet in said case clearly shows the undersigned as counsel for the Plaintiff, as does the Complaint. [USDC, WD TN, Docket Entry No. 1, entered 4/7/06]. A copy of the Complaint is attached hereto as **EXHIBIT A.**

8.  As part of my duties as co-counsel for the Plaintiff, I participated in multiple conferences, preparation of pleadings and attendance at hearings in open Court, and generally carried out those duties including conferring with the Wolf Haldenstein firm regarding procedures and settlement issues.

9.   From and after the filing of the lawsuit, I served not only as local counsel for the Wolf Haldenstein firm, but, in addition, after extensive briefing by all counsel in the case, a Report and Recommendation was signed by Magistrate Judge Tu Pham by which he recommended, *inter alia*, that I be appointed as Interim Liaison Counsel in that case. [USDC, WD TN, Docket Entry No. 14, entered 5/25/06]. A copy of the Report and Recommendation is attached hereto as **EXHIBIT B**.

10.  It is clear from the very Report and Recommendation relied upon by Defendants in the instant action that their theory is unsupported. Contrary to Defendants' claims that I was not involved in the handling of the original, underlying case, the very Report refutes those claims, as the Court, through Magistrate Judge Pham, clearly appointed me as Interim Liaison Counsel, in which capacity I served.

11.  I can certify that I have expressly authorized the filing of the instant case in the New York state court, I have expressly authorized the filing of the Complaint, and I do expressly claim a part of the fee which has been prevented from being paid to the Plaintiffs, including fees due to my firm.

12.  I hereby certify that I am not a Plaintiff in the action in New York state court for improper purposes, as alleged by Defendants, but that my firm has a claim for fees the payment of which these defendants have thwarted and hindered. My firm's claim is every bit as valid as that of the other attorneys named as Plaintiffs, all of whom are due fees from the settlement.

13.    Attached as **EXHIBIT C** is a true and correct copy of Defendants' Notice of

Removal to the United States District Court for the Southern District of New

York, dated June 25, 2008.


FURTHER AFFIANT SAYETH NOT.

_____
PAUL KENT BRAMLETT

# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

POOLPAK TECHNOLOGIES CORP., on behalf
of itself and all others similarly situated,

     Plaintiff,

v.

OUTOKUMPU OYJ, OUTOKUMPU COPPER
PRODUCTS OY, OUTOKUMPU COPPER (U.S.A.)
INC., OUTOKUMPU COPPER FRANKLIN, INC.,
OUTOKUMPU HEATCRAFT USA LLC; MUELLER
INDUSTRIES, INC., MUELLER EUROPE LTD.,
WIELAND WERKE AG, KM EUROPA METAL
AG, TREFIMETAUX SA, EUROPA METALLI SpA;

     Defendants.

Case No.:_____

JURY TRIAL REQUESTED

CLASS ACTION COMPLAINT

## CLASS ACTION COMPLAINT

Plaintiff hereby alleges, individually and on behalf of a class of all those similarly situated (defined below), on personal knowledge or information and belief based upon investigation made by and through its attorneys, as follows:

### NATURE OF THE CASE

1.    This lawsuit arises from a long-standing illegal international cartel carried out by the Defendants. Plaintiff PoolPak Technologies Corp. is a manufacturer of commercial air-conditioning and swimming pool dehumidifying equipment and is a purchaser of ACR Copper Tubing (defined below). Defendants are major international manufacturers and distributors of ACR Copper Tubing, who entered into an unlawful, combination and conspiracy with each other

1

and with other companies to illegally restrain trade, allocate customers, and fix and maintain the

price of ACR Copper Tubing.  Plaintiff brings this antitrust case seeking redress under the U.S.

antitrust laws for the harm caused by this unlawful conspiracy.

2.       Beginning at least as early as May 1988, and continuing thereafter until at least

December 2003, Defendants engaged in a world-wide conspiracy, the purpose and effect of

which was to fix, raise, maintain, and/or stabilize prices and to allocate markets and customers

for ACR Copper Tubing sold in the United States, Europe, and elsewhere.   Because of

Defendants' and their co-conspirators' unlawful conduct, Plaintiff paid artificially inflated and

supra-competitive prices for ACR Copper Tubing and, as a result thereof, has suffered antitrust

injury to its business and property.

## JURISDICTION AND VENUE

3.       Plaintiff brings this action pursuant to Sections 4 and 16 of the Clayton Act, 15

U.S.C. § 15 and 26, for treble damages and injunctive relief as well as reasonable attorneys' fees

and costs of suit, for Defendants' violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

4.       Jurisdiction is conferred upon this Court by 28 U.S.C. § 1331 and 1337, and by

Sections 4 and 16 of the Clayton Act, 15 U.S.C. § 15(a) and 26.

5.       This Court has *in personam* jurisdiction over each of the Defendants because each

was engaged in an illegal market-allocation and price-fixing scheme and conspiracy in

unreasonable restraint of trade that was directed at, and had the intended effect of causing injury

to, persons and entities residing in, located in, or doing business in the United States.   There is

also *in personam* jurisdiction over Defendants because Defendants were found or had agents

present in the United States, including, *inter alia*, in Tennessee.

2

6.      Venue is proper in this Judicial District pursuant to Sections 4(a) and 12 of the Clayton Act, 15 U.S.C. § 15(a) and 22, and 28 U.S.C. § 1391 (b), (c) and (d), because one or more of the Defendants resided, transacted business, was found, or had agents in this District, and because a substantial part of the events giving rise to Plaintiff's claims occurred, and a substantial portion of the affected interstate trade and commerce described below has been carried out in this District.


## DEFINITIONS

7.      As used in this Complaint:

(a)     "ACR Copper Tubing" refers to, but is not limited to, copper tubes used in the manufacturing of air-conditioning and refrigeration ("ACR") units. This includes both straight length tubes and annealed level wound coils ("LWC").

(b)     "Relevant Period" means at least the time period of May 1988 through December 2003.


## PLAINTIFF

8.      Plaintiff PoolPak Technologies Corp. is a company incorporated under the laws of Pennsylvania, with registered offices in York, Pennsylvania.  PoolPak Technologies Corp. is a successor in interest to PoolPak, Inc (hereinafter referred to as "Poolpak").  During the Relevant Period, PoolPak purchased ACR Copper Tubing from one or more of the Defendants or their co-conspirators.  As a result of Defendants' conspiracy, PoolPak has been injured in its business and property because the prices it paid were artificially raised to anti-competitive levels by Defendants and their co-conspirators.

3

## DEFENDANTS

9.      Defendant Outokumpu Oyj is a company organized under the laws of Finland with registered office located in Espoo, Finland. Outokumpu Oyj was engaged in the production or sale of ACR Copper Tubing in the United States, Europe, and elsewhere, directly, and through its wholly-owned subsidiaries during the Relevant Period.

10.     Defendant Outokumpu Copper Products Oy ("Outokumpu Copper") is a company organized under the laws of Finland with registered office located in Espoo, Finland. Outokumpu Oyj was engaged in the production or sale of ACR Copper Tubing in the United States, Europe, and elsewhere, directly, and through its wholly-owned subsidiaries during the Relevant Period.

11.     Defendant Outokumpu Copper (U.S.A.), Inc. ("Outokumpu Copper U.S.A.") is a company organized under the laws of the United States with its principal place of business located in Bloomingdale, Illinois. It has a registered agent, CT Corporation System, located at 208 S. LaSalle Street, Suite 814, Chicago, IL 60604. Outokumpu Copper U.S.A. was engaged in the production or sale of ACR Copper Tubing in the United States, Europe, and elsewhere, directly, and through its wholly-owned subsidiaries during the Relevant Period.

12.     Defendant Outokumpu Copper Franklin, Inc. ("Outokumpu Copper Franklin") is a company organized under the laws of the United States with registered agent CT Corporation System located at 239 South 5th Street, Suite 1511, Louisville, KY 40202. Outokumpu Copper Franklin was engaged in the production or sale of ACR Copper Tubing in the United States, Europe, and elsewhere, directly, and through its wholly-owned subsidiaries during the Relevant Period.

13.     Defendant Outokumpu Heatcraft USA, LLC,("Heatcraft") is a Delaware limited liability company that was created per a July 18, 2002 joint venture agreement between

4

Outukumpu Oyj and Lennox International, Inc. ("Lennox").  The joint venture mainly consisted of Lennox's worldwide heat transfer operations, which included subsidiaries in Europe. Outokumpu controlled 55% of the venture until June, 2005, when it exercised its option to purchase the remaining 45% of Outokumpu in order to sell their subsidiary, Outokumpu Copper Products (of which Heatcraft is part) to Nordic Capital.  Heatcraft is now a subsidiary of Nordic Capital, a private equity firm focusing on investments primarily in the Nordic middle-market arena.  Heatcraft has its principal place of business located in Grenada, Mississippi. During the Class Period, Heatcraft directly or through its subsidiaries, affiliates, and/or predecessor companies, produced ACR Copper Tubing and sold them throughout the United States, Europe and elsewhere.

14.     Collectively, Outokumpu Oyj, Outokumpu Copper, Outokumpu Copper U.S.A., Outokumpu Copper Franklin and Heatcraft will be referred to as "Outokumpu."  During the relevant period, these entities had coordinated and interrelated business operations in the ACR Copper Tubing market, acting with a unity of interest.  The parent company, Outokumpu Oyj, had effective control over the commercial policy and business decisions of its subsidiaries, and did business through its subsidiaries.

15.     Defendant Mueller Industries, Inc. ("Mueller") is a company organized under the laws of the United States with its principal place of business located in Memphis, Tennessee.  It has a registered agent, CT Corporation System, located at 800 South Gay Street, Knoxville, TN 37929.  Mueller owns and operates plants throughout the United States.  Mueller was engaged in the production or sale of ACR Copper Tubing in the United States directly, and through its wholly-owned subsidiaries during the Relevant Period.

5

16.     Defendant Mueller Europe Ltd. ("Mueller Europe") is a limited liability company organized under the laws of the United Kingdom with Its principal place of business located at Oxford Street, Bilston West Midland, WV14 7DS, Great Britain.   It is a wholly owned subsidiary of Defendant Mueller.   Mueller Europe was engaged in the production or sale of ACR Copper Tubing in the United States, Europe, and elsewhere, directly, and through its wholly-owned subsidiaries during the Relevant Period.

17.     Collectively, Mueller and Mueller Europe will be referred to as "Mueller." During the relevant period, these entities had coordinated and interrelated business operations in the ACR Copper Tubing market, acting with a unity of interest.   The parent company, Mueller Industries, had effective control over and did business through its subsidiaries.

18.     Defendant Wieland Werke AG ("Wieland") is a company organized under the laws of Germany with its principal place of business located in Ulm Germany.   During the Class Period, Wieland, directly or through its subsidiaries and/or affiliates, produced ACR Copper Tubing and sold them throughout the United States.

19.     Defendant KM Europa Metal AG ("KM Europa") is a company organized under the laws of Germany with its principal place of business located Osnabruck, Germany.   During the Class Period, KM Europa, directly or through its subsidiaries and/or affiliates, produced ACR Copper Tubing and sold them throughout the United States.

20.     Defendant Tréfimétaux SA is a company organized under the laws of France with its principal place of business located in Sérifontaine, France.   During the Class Period, Tréfimdtaux directly or through its subsidiaries and/or affiliates, produced ACR Copper Tubing and sold them throughout the United States.

6

21.    Defendant Europa Metalli SpA ("Europa Metalli") is a company organized under the laws of Italy with its principal place of business located in Florence, Italy.  During the Class Period Europa Metalli, directly or through its subsidiaries and/or affiliates, produced ACR Copper Tubing and sold them throughout the United States.

## UNNAMED DEFENDANTS AND CO-CONSPIRATORS

22.    Various individuals, partnerships, corporations and associations other than the Defendants named in this Complaint (the "co-conspirators") have participated in the violations of the federal antitrust laws for which Plaintiff seeks relief, and have performed acts and made statements in furtherance thereof.

23.    Whenever, in this Complaint, reference is made to any act, deed, or transaction of any corporation, the allegation means that the corporation engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

## THE COPPER TUBING MARKET

24.    Generally, copper tubing is divided into two main product groups: 1) plumbing tubes (also called sanitary tubes), which are used for water, oil, gas, and heating installations, and 2) higher value-added industrial tubes, which are divided into subgroups based on their end use. The most significant of the industrial tube types in terms of volume is tubing for air-conditioning and refrigeration ("ACR") applications.

7

25.     ACR Copper Tubing provides the situs in these ACR applications for the heat
exchange.  The exterior walls of the ACR Copper Tubing are exposed to the coolant refrigerant,
which reduces the temperature of the air contained within the tube.  Copper is the ideal metal for
the walls of these tubes due to its high level of thermal conductivity.

26.     ACR Copper Tubing is typically supplied in two forms.   The first is called
straight length tubes, which are hard or "drawn" tubes.  The second is a more advanced type of
tube called level wound coils ("LWC"). LWCs are soft or "annealed" tubes that have a higher
thermal conductivity than the straight length tubes because they have thinner walls.  In addition,
a superior form of LWC is called inner grooved tubing ("IGT"), also called "enhanced LWC",
which has grooves to further increase thermal conductivity by increasing the tube's surface area.

27.     The price of ACR Copper Tubing consists of two elements: 1) the price of the raw
material, copper, and 2) the conversion price.  The price of the copper is usually set based on the
London Metal Exchange ("LME") index.  The conversion price corresponds to the value added
by the manufacturer, which includes the profit margin.

28.     In some instances, a customer will provide the copper raw material, and the
manufacturer would then charge a price based solely on the conversion price.  These are called
"tolling" arrangements.

29.     LWCs, and in particular enhanced LWCs, typically have a significantly higher
conversion price because of the higher value added by the manufacturer.

8

## **DEFENDANTS' WRONGFUL CONDUCT**

### **Trade and Interstate Commerce**

30.     Beginning at least as early as May of 1988 and during the Relevant Period, Poolpak purchased ACR Copper Tubing from one or more of the Defendants and/or their co-conspirators.

31.     Defendants and their co-conspirators are located in various states throughout the United States and in a number of countries throughout the world.

32.     During the Relevant Period, the market for the manufacture and sale of ACR Copper Tubing was a global economic market.  Defendants and their co-conspirators directed their anticompetitive conduct not just at the United States but also at the global market for the manufacture and sale of ACR Copper Tubing.

33.     During the Relevant Period, Defendants and their co-conspirators sold ACR Copper Tubing in a continuous and uninterrupted flow of interstate and foreign trade and commerce to customers located in countries and in states other than the countries or states in which the Defendants produced ACR Copper Tubing.

34.     The supply chain dynamics of the global ACR Copper Tubing market, such as supply cost and lead time, are conducive to importing and exporting product between the different sales regions.  Therefore, customers purchase ACR Copper Tubing both in their own sales region and in others, further illustrating the global nature of this market.

35.     The activities of Defendants and their co-conspirators were within the flow of, and substantially affected, interstate and foreign trade and commerce.

36.     The worldwide conspiracy in which the Defendants and their co-conspirators participated had a direct, substantial, and reasonably foreseeable effect on United States commerce.

37.     Among other unreasonable restraints on interstate trade and commerce, Defendants' combination and worldwide conspiracy artificially raised the price of ACR Copper Tubing in the United States, Europe, and elsewhere, and deprived Plaintiff of the benefits of free and open interstate competition for ACR Copper Tubing.

## General Allegations of Defendants' Illegal Conduct

38.     Beginning at least as early as May 1988, and continuing thereafter until at least December 2003, Defendants and their co-conspirators engaged in a continuing combination and conspiracy with respect to the sale of ACR Copper Tubing in the global market, including the United States, Europe, and elsewhere, in unreasonable restraint of interstate and foreign trade and commerce.

39.     The combination and conspiracy consisted of an agreement among the Defendants and their co-conspirators, the substantial terms of which were to allocate customers and to fix, raise stabilize and maintain at artificially high levels the prices they charged for ACR Copper Tubing in the United States, Europe, and elsewhere.

40.     For the purpose of forming and effectuating their combination and conspiracy, Defendants and their Co-conspirators have done those things that they combined and conspired to do, including, among other things:

    (a)     Participating in meetings and conversations, including the biannual meetings of the ACR Copper Tubing trade association called the Cuproclima Quality Association, during the Relevant Period to discuss

and fix the prices of ACR Copper Tubing sold in the United States, Europe, and elsewhere;

(b)    Agreeing to charge prices at certain levels and otherwise fix, increase, and maintain prices of ACR Copper Tubing sold in the United States, Europe, and elsewhere;

(c)    Selling ACR Copper Tubing at the agreed upon prices and/or in conformity with their combination and conspiracy;

(d)    Agreeing to allocate sales regions and customers of ACR Copper Tubing sold in the United States, Europe, and elsewhere so as to reduce competition and to raise, stabilize and maintain artificially high price levels;

(e)    Instituting mechanisms to monitor compliance with and to punish any deviation from the combination and conspiracy;

(f)    Instituting a strategy of coordinating price bids submitted to major purchasers of ACR Copper Tubing;

(g)    Engaging in coordinated attempts to lure competitors into the combination and conspiracy;

(h)    Engaging in coordinated attempts to purchase, financially subjugate, or drive competitors out of business;

(i)    Agreeing to conceal and keep secret their illegal combination and conspiracy; and

(j)    Removing, concealing or destroying documents containing evidence of their illegal conduct.

41.    Defendants conspired in a global price-fixing scheme that had the direct and substantial effect of keeping prices paid by purchasers in the United States artificially high. Price movements in each sales region were inextricably linked to all other regions so that the prices charged by Defendants and their co-conspirators in other countries directly impacted United States prices. Defendants fixed prices and allocated or controlled customers in the United States not merely to capture cartel profits in the United States, but also to allow the cartel to be

effective anywhere in the world. Defendants and their co-conspirators knew that their conspiracy would not succeed unless they coordinated their prices and market shares throughout the world.

42.   Many purchasers of ACR Copper Tubing are multinational corporations that buy these products in Europe, the U.S, Asia and elsewhere. Because of this, Defendants affirmatively acted to eliminate any regional procurement price differentials by setting and maintaining artificially high prices throughout the global market.   For example, in furtherance of the conspiracy, Defendants acted to assure that prices for ACR Copper Tubing in the U.S. were no less expensive (taking shipping costs into account) than anywhere else in the global market. Otherwise, multinational corporate purchasers would have been able to purchase all of the corporation's world-wide demand for ACR Copper Tubing in the U.S. and then ship those products to facilities world-wide.   Defendants recognized that such behavior by multinational buyers would be immediately damaging to the cartel's profitability and stability.   Thus, Defendants acted to shut down regional price differentials, at least to an extent that prevented intra-firm arbitrage-like behavior on the part of multinational corporate purchasers.

43.   The combination and conspiracy engaged in by the Defendants and their co conspirators was an unreasonable restraint of interstate and foreign trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

**Cuproclima Quality Association and Formation of the Cartel**

44.   The Cuproclima Quality Association for ACR Tubes ("Cuproclima") was established on September 27, 1985, with the primary purpose of establishing and controlling a quality standard and label for ACR Copper Tubing.   The members included Defendants and their co-conspirators.

45.    By at least the late 1980's, and as described in detail below, Cuproclima became the principal vehicle through which Defendants coordinated their price fixing and market allocation activities.

46.    Official Cuproclima meetings would occur two times a year, once in the spring and once in the fall.  Starting at least since May 1998, an "unofficial" agenda was added to the regular official meetings.  It was these meetings provided a regular opportunity for Defendants to discuss and fix prices and other commercial conditions, but they were supplemented with frequent bilateral contacts.

47.    While the conspiracy primarily involved Cuproclima members, outsiders, such as Desnoyers and Austria Buntmetall, are known to have participated in some of its activities in the mid- 1990's.

48.    Cuproclima was officially disbanded after a European Commission investigation began in March 2001.


**Specific Activity of the Conspiracy**

49.    With the Cuproclima meetings as a foundation, Defendants engaged in a world wide conspiracy to fix, raise, maintain, and/or stabilize prices and to allocate markets and customers for ACR Copper Tubing sold in the United States, Europe, and elsewhere during the Relevant Period.

50.    The illegal conspiracy consisted primarily of setting target prices and agreeing on concerted price increases.  The fall Cuproclima meetings would take place prior to these negotiations, and a primary purpose of these meetings was for Defendants to coordinate their individual negotiations with customers in furtherance of the conspiracy.  At the following spring

Cuproclima meetings, Defendants would monitor each party's compliance with the agreed upon price targets and customer allocations by analyzing the general market information and the development of market shares.

51.    The success of any price increase depended on the producers being content to maintain their market share at the prevailing level, hence the need to establish a base for comparison and a continuing monitoring system. Accordingly, Defendants allocated customers and froze their market shares. Implementation was ensured through a "market leader" arrangement for certain territories and key customers. Compliance was further monitored through regular exchanges of confidential information by fax, e-mail, and phone, as well as in the unofficial Cuproclinia meetings.

52.    Because the cost of copper was based on the LME index, Defendants' price collusion related to the conversion price element of the total cost of ACR Copper Tubing. General price increase announcements were not made, because purchasers included large industrial companies for whom prices were individually negotiated once a year.

53.    In furtherance of this conspiracy, Defendants would frequently exchange competitively sensitive information, such as pricing and volume information for specific customers.

54.    There were essentially three elements to Defendants' illegal cartel: 1) fixing of target conversion prices and other commercial terms; 2) allocation of market shares and customers; and 3) monitoring and implementation mechanisms.

14

**Fixing of Target Prices and Other Commercial Terms**

55.     Specific evidence of Defendants' cooperation to fix conversion prices and other

terms of ACR Copper Tubing during the Relevant Period includes, but is in no way limited to,

the following:

(a)     Handwritten notes taken by an Outokumpu representative demonstrate price cooperation among competitors was functioning well in 1989.  They state, "Cuproclima working fine.... Current situation [LWC tubes] is good.  Demand is high.  Prices have been raised . . . Cuproclima works well."

(b)     On October 29-30. 1992, an internal document of one of the cartel members notes the objective "focalize our efforts to increase the prices at least 10% in the countries where the currency was devaluated."

(c)     In 1992, cartel members had bilateral discussions with regard to the target prices and the level of price increase.

(d)     An internal Outokumpu fax in August 1994 notes "the price increase of ACR tubes in Europe — target 20%."

(e)     In September 1994, the Defendants agreed to specific increased prices for 1995. Defendants and their co-conspirators subsequently implemented these collusive price increases.

(f)     On July 24, 1995, Defendants and their co-conspirators set their 1996 price targets at a multi-lateral meeting. The targets ranged from 5% to 10%.

(g)     From May 17-19, 1995, in France, cartel members met to further memorialize the details of the illegal cartel.  Among other things, the parties agreed to certain market conditions and security rules to keep the cartel secret, such as an agreement not to memorialize the content of the meetings.

(h)     At the Cuproclima meeting in Prague on October 31, 1995, Defendants and their co-conspirators presented tables containing each producer and customer, with indication of prices and volumes for each customer and the targets Defendants agreed upon to be reached. They also indicated the order in which Defendants would approach a particular customer to announce the price increase, as well as other terms of the agreement.

15

    (i)     In 2000, Defendants and their co-conspirators jointly prepared a pricing sheet that contained price increase targets for 2001. The targets ranged from 4% to 5.5%.

    (j)     The cartel members had regular contacts over the phone to discuss individual customers or prices. These calls took place until at least March 2001.

    (k)     The last known Cuproclima meeting during which commercial issues were discussed was in Zurich on February 2, 2001. As noted in the internal documents of one of the cartel members, Defendants shared their market share and sales volume data for 1998-2000, and projections for 2001-2003.

56.     In addition to fixing prices, Defendants agreed upon other types of commercial terms such as payment terms and consignment stocks.

**Allocation of Market Shares and Customers**

57.     Specific evidence of Defendants' cooperation to allocate customers and market shares in the ACR Copper Tubing industry during the Relevant Period includes, but is in no way limited to, the following:

    (a)     Unofficial minutes of a Cuproclima meeting note that the Defendants agreed upon specific market shares that would be controlled during a subsequent meeting to monitor eventual deviations. Defendants further agreed that if a market share loss was found, they would examine the reason for the loss and then attempt to reestablish the agreed upon market share percentages.

    (b)     To agree upon customer allocations, an identification number assigned to a specific customer would be called at a Cuproclima meeting, and the Defendants supplying that customer would answer the call and withdraw from the meeting to discuss how to proceed towards that customer with respect to pricing, supply quantities and terms and conditions. If another Defendant also wanted to supply ACR Copper Tubing to that customer, there was a mechanism for conveying that request to the existing supplier, who ultimately made the decision as to whether to grant that Defendant a supply share.

16

(c)     The customer allocation was also implemented with Defendants'
agreement to quote artificially high prices if a supplier was
approached by a customer that was not allocated to it.

**Monitoring and Implementation Mechanisms**

58.     To police the illegal cartel, Defendants appointed 'market leaders" who were
responsible for determining and managing prices the conspirators would charge in certain
regions.  The market leader was usually the Defendant with the highest sales of ACR Copper
Tubing in that region.

59.     A cartel member's business document explains that "[t]he mission of the market
leader is to protect the interest of each member as agreed.  He has to manage the sequence of
visits, he must be informed before each visit and immediately after the report of the negotiation.
Only the market leader can change the targets if necessary and must inform immediately all the
[companies] involved.  No change to be applied before everybody is informed. In the case of
disagreement between a member and a market leader the market leader is taking the final
decision."

60.     Periodically, the Defendants would meet for the purpose of controlling
compliance.  Thus, for example, an internal Outokumpu report concerning the spring Cuproclima
meeting in 1993 at Tegernsee, Germany, expressed concern over controlling compliance in the
future noting "the next meeting we will reassess how the compliance with these principles could
be ensured."

61.     In addition to the market leader arrangement, the illegal cartel was monitored
through exchanges of detailed information on sales, market shares, customers, and prices.  For
example, during the cartel the Defendants developed a spreadsheet to facilitate the compilation

of such detailed information.  Thereafter, they brought laptop computers to their meetings and

exchanged this spreadsheet information on disks to facilitate data processing and dissemination

of the information.

## EUROPEAN COMMISSION INVESTIGATION AND FINES

62.     On December 16, 2003, the European Commission ("EC") adopted a decision and

assessed fines totaling €79 million against participating companies in an international price-

fixing and market allocation conspiracy in the ACR Copper Tubing industry.  Specifically, the

following fines were imposed:

> Outokumpu Oyj and Outokumpu Copper- €18,130,000;
>
> Wieland — €20,790,000;
>
> KME-Group — €18,990,000;
>
> KM Europa— €10,410,000; and
>
> Europa Metalli and Trèfimètaux — €10,410,000.

63.     The EC determined that these entities illegally agreed on price targets and other

commercial terms for ACR Copper Tubing, coordinated price increases, allocated customers and

market shares, as well as monitored implementation of their competitive arrangements by a

market leader arrangement, and by exchanging competitively sensitive information.

64.     The EC's Decision catalogues the charged parties' continuous and frequent efforts

to reap profits from their illegal cartel arrangement for over a decade.  The Commission further

found that "of the parties substantially contested . . . the anti-competitive infringements identified

in this Decision."

65.    The Commission announced that Mueller was also a participant in the cartel, but granted the company full immunity, because it was the first to provide information about the cartel's agreement.    The Commission decision identifies Mueller's illegal involvement through the findings against Mueller Europe's predecessor entity, Desnoyers. Mueller acquired Desnoyers in 1997 and concealed the cartel for approximately four years thereafter before finally disclosing it to the EC in March 2001.

66.    The participants in the cartel that was investigated by the Commission did not limit their activities to Europe.    The EC decision primarily concerned itself with conduct in Europe because its jurisdiction does not extend beyond the European Union.    However, the combination and conspiracy was global in scope, as evidenced by, among other things, the following facts:

    (a)    Representatives of Cuproclima members engaged in the illegal, activity, including without limitation representatives of the cartel members' management boards and the chief executive officer of Outokumpu Oyj had responsibility for the cartel members' global businesses;

    (b)    Purchasers of ACR Copper Tubing were large industrial companies with global operations;

    (c)    Defendants coordinated negotiations with their customers in the United States in accordance with the fall Cuproclima meetings, waiting until after these meetings to negotiate yearly contracts with customers such as Plaintiff;

    (d)    Prices in the United States had to be maintained at levels comparable to those in other regions in order to maintain the price levels in Europe and elsewhere; and

    (e)    Documentary evidence reflects the existence of a global conspiracy.

67.    Thus, by way of example, an internal Outokumpu document reflects the existence of a "Global Agreement" that had to accept in order to ensure a properly functioning

19

cartel, a substantial agreed-upon price increase, and the protection of its customer allocation from competition.

## FRAUDULENT CONCEALMENT

68.    Plaintiff had no knowledge of the combination and conspiracy alleged in this Complaint, or of any facts that could or would have led to the discovery thereof, until after December 16, 2003, the date of the EC Decision. Plaintiff could not have discovered these violations at an earlier date through the exercise of due diligence, because the Defendants and their co-conspirators employed acts and techniques that were calculated to conceal the existence of such illegal conduct.

69.    Defendants and their co-conspirators engaged in a successful illegal price-fixing conspiracy with respect to ACR Copper Tubing, which was affirmatively concealed, as set forth herein, and which, by its nature, was inherently self-concealing, in at least the following respects:

(a)    by utilizing covert meetings, discussions and communications to devise and implement their illegal course of conduct;

(b)    by agreeing among themselves not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their illegal scheme;

(c)    by giving false and pretextual reasons for the pricing of ACR Copper Tubing sold by them during the Relevant Period and by describing such pricing falsely as being the result of competitive factors rather than collusion; and

(d)    by destroying or suppressing evidence of their illegal conduct.

70.    The EC noted the extent to which Defendants affirmatively concealed their illegal price-fixing conspiracy. It summarized the parties' actions to conceal the conspiracy as follows: "The anticompetitive object of the parties is also shown by the fact that they took explicit action

to conceal their meetings and to avoid detection of their agreements and documents.  To this

effect, they established security rules to prevent a paper trail . . . and used a coding-system to

hide the identity of the producers in their documents and spreadsheets concerning target prices....

Moreover, certain documents concerning Cuproclima meetings contain an express mention

instructing the addressee to destroy the document after reading, which further indicates the

illegal purpose of the meeting and the intention to conceal it."

71.    Because of these overt acts of concealment of the price-fixing conspiracy, the

statute of limitations applicable to Plaintiff's claims, as alleged in this Complaint, did not begin

to run until December 16, 2003, at the earliest.


## EFFECTS

72.    Defendants' combination and conspiracy has had the following effects:

(a)    prices for ACR Copper Tubing sold by Defendants and their co-
conspirators were fixed, raised, stabilized, and maintained at artificially
high and non-competitive levels in the United States, Europe, and
elsewhere;

(b)    Plaintiff was deprived of the benefits of free and open competition in the
purchase of ACR Copper Tubing in the United States, Europe, and
elsewhere;

(c)    price competition in the sale of ACR Copper Tubing was restrained,
suppressed and eliminated in the United States, Europe, and elsewhere;
and

(d)    as a direct and proximate result of the illegal conspiracy, Plaintiff and
members of the class paid more for ACR Copper Tubing in the United
States, Europe and elsewhere than they would have paid in the absence of
the illegal conspiracy, have been injured in their business or property, and
have suffered damages in an amount presently undetermined.


## CLASS ACTION ALLEGATIONS

73.     Plaintiff brings this action on behalf of itself and as a class action under the

provisions of Rule 23(a) b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all

members of the following Class:

> All persons (excluding governmental entities, Defendants, and
> their subsidiaries, affiliates and co-conspirators) who directly
> purchased ACR Copper Tubing in the United States from any of
> the Defendants or any subsidiary or affiliate thereof, or any co
> conspirator, at any time during the period from June 1, 1988 to at
> least December, 2003 (the "Class").

74.     Plaintiff does not know the exact size of the Class because such information is in

the exclusive control of the Defendants. Nevertheless, there are hundreds of Class members

geographically dispersed throughout the United States. Due to the nature of the trade and

commerce involved, Plaintiff believes that Class members are so numerous that joinder of all

Class members in this action is impracticable.

75.     Plaintiff's claims are typical of the claims of the members of the class because

Plaintiff and Class members are direct purchasers of ACR Copper Tubing who paid artificially

inflated prices for ACR Copper Tubing due to Defendants' contract, conspiracy or combination

alleged herein.

76.     Plaintiff will fairly and adequately protect the interests of the Class as the interests

of Plaintiff are coincident, and not antagonistic to, those of the Class. In addition, Plaintiff is

represented by counsel who are experienced and competent in the prosecution of complex class

action and antitrust litigation.

77.     The prosecution of separate actions by individual members of the Class would

create a risk of inconsistent or varying adjudications. establishing incompatible standards of

conduct for Defendants.

78.    Questions of law and fact common to the members of the Class predominate over

questions that may affect only individual members. Defendants have acted on grounds generally

applicable to the entire Class. Among the questions of law and fact common to the Class are:

(a)    whether Defendants and their co-conspirators engaged in a contract, conspiracy or combination to raise, fix, stabilize or maintain prices of ACR Copper Tubing sold in the United States:

(b)    whether the alleged contract, conspiracy or combination violated Section 1 of the Sherman Act;

(c)    the duration and extent of the contract, conspiracy or combination alleged herein;

(d)    whether the Defendants and their co-conspirators took affirmative steps to conceal the contract, conspiracy or combination;

(e)    whether each of the Defendants was a participant in the contract, conspiracy or combination alleged herein;

(f)    whether the Defendants' conduct caused the prices of ACR Copper Tubing to be set at an artificially high and anti-competitive level;

(g)    the effect of Defendants' contract, conspiracy or combination upon interstate commerce; and

(h)    the appropriate measure of damages.

79.    Class action treatment is superior to the alternatives for the fair and efficient

adjudication of the controversy alleged herein. Such treatment will permit a large number of

similarly situated persons to prosecute their common claims in a single forum simultaneously.

efficiently, and without the duplication of effort and expense that numerous individual actions

would engender. No difficulties are likely to be encountered in the management of this class

action that would preclude its maintenance as a class action, and no superior alternative exists for

the fair and efficient adjudication of this controversy. The Class is readily ascertainable from the

Defendants' records.

**FIRST CAUSE OF ACTION**

**Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1**

80.     Plaintiff re-alleges and incorporates each, and every allegation set forth in the paragraphs above.

81.     Beginning at least as early as May 1988, and continuing thereafter until at least December 2003, the exact dates being unknown to Plaintiff, Defendants engaged in a continuing contract, combination, and conspiracy to fix prices of ACR Copper Tubing in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

82.     The contract, combination, and conspiracy alleged herein consisted of a continuing agreement, understanding, and concert of action among Defendants, the substantial terms of which were to raise, fix, and maintain prices of ACR Copper Tubing sold in the United States, Europe, and elsewhere.

83.     For the purpose of forming and carrying out the alleged contract, combination and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including, but not limited to, meeting to discuss and agree upon future price increases and other activities designed to implement the illegal price conspiracy.

84.     During the Relevant Period, Plaintiff and members of the class directly purchased ACR Copper Tubing from Defendants and other manufacturers of ACR Copper Tubing.  By reason of the violations of the antitrust laws of the United States alleged herein, Plaintiff and members of the class paid more for ACR Copper Tubing than they would have in the absence of Defendants' illegal contract, combination, and conspiracy.  As a result, Plaintiff and members of the class have been injured and has suffered damages in an amount presently undetermined.

24

**REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiff requests that:

1.      The Court determine that this action may be maintained as a class action pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure.

2.      The unlawful contract, combination and conspiracy alleged in this Complaint be adjudged and decreed to be in unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act.

3.      Plaintiff recover damages, as provided by law, that Defendants be held liable for the damages suffered by Plaintiff and members of the class, and that judgment in favor of Plaintiff and members of the class be entered against Defendants in an amount to be trebled in accordance with the antitrust laws;

4.      Injunctive relief enjoining, preliminarily and permanently, Defendants from continuing the unlawful contract, combination and conspiracy alleged herein, be entered;

5.      Plaintiff and members of the class recover their costs of suit, including reasonable attorneys' fees, as provided by law;

6.      Plaintiff and members of the class recover prejudgment interest pursuant to Section 4(A) of the Clayton Act, 15 U.S § 15(a); and

7.      Plaintiff and members of the class be granted such other and further relief as the nature of the case may require or as may seem just and proper to this Court.

**JURY TRIAL DEMANDED**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury of all issues so triable.

Respectfully submitted,


**GLASSMAN, EDWARDS, WADE
& WYATT, P.C.**
By:  /s B. J. Wade
       B. J. Wade (#5182)
       26 North Second Street
       Memphis, TN 38103
       Telephone: (901) 527-4673
       Facsimile:  (901) 521-0940
       bwade@gewwlaw.com


**BRAMLETT LAW OFFICES**
By:  /s Paul Kent Bramlett
       Paul Kent Bramlett (#7387)
       Post Office Box 150734
       Nashville, Tennessee 37215-0734
       Telephone:  (615) 248-2828
       Facsimile:  (615) 297-3444
       MS SUP CT #4291
       pknashlaw@aol.com


       OF COUNSEL:

       Mary Jane Edelstein Fait
       **WOLF HALDENSTEIN ADLER
         FREEMAN & HERZ LLP**
       55 West Monroe Street
       Suite 1111
       Chicago, Illinois 60603
       Telephone:  (312) 984-0000
       Facsimile:  (312) 984-0001
       fait@whafh.com


       William M. Audet
       **ALEXANDER, HAWES &
       AUDET, LLP**
       300 Montgomery Street, Suite 400
       San Francisco, CA 94104
       Telephone:  (415) 982-1776
       Facsimile:  (415) 576-1776
       waudet@alexanderlaw.com


*Counsel for Plaintiff PoolPak
Technologies Corp.*

26

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

_____

|  |  |  |
|---|---|---|
| POOLPAK TECHNOLOGIES CORP., on behalf of itself and all others similarly situated, | ) ) ) ) |  |
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| vs. | ) | Civil No. <u>06-2207 D/P</u> |
|  | ) |  |
| OUTOKUMPU OYJ, et al., | ) |  |
|  | ) |  |
| Defendants. | ) |  |
|  | ) |  |

_____

|  |  |  |
|---|---|---|
| UNITED COOLAIR CORP. on behalf of itself and all others similarly situated, | ) ) ) |  |
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| vs. | ) | Civil No. <u>06-2211-Ma/P</u> |
|  | ) |  |
| OUTOKUMPU OYJ, et al., | ) |  |
|  | ) |  |
| Defendants. | ) |  |
|  | ) |  |

_____

|  |  |  |
|---|---|---|
| TWINCO SUPPLY CORPORATION on behalf of itself and all others similarly situated, | ) ) ) |  |
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| vs. | ) | Civil No. <u>06-2225-B/P</u> |
|  | ) |  |
| OUTOKUMPU OYJ, et al., | ) |  |
|  | ) |  |
| Defendants. | ) |  |
|  | ) |  |

_____

**ORDER GRANTING PLAINTIFF'S MOTION TO CONSOLIDATE AND
COORDINATE RELATED ACTIONS, GRANTING DEFENDANTS' MOTIONS FOR
ADDITIONAL TIME TO ANSWER OR OTHERWISE RESPOND TO COMPLAINT, AND
REPORT AND RECOMMENDATION ON PLAINTIFF'S MOTION TO APPOINT
PLAINTIFFS' INTERIM LEAD COUNSEL AND LIAISON COUNSEL**

Before the court is plaintiff PoolPak Technologies Corp.'s
("PoolPak") Motion to Consolidate and Coordinate Related Actions
and Appoint Plaintiffs' Interim Lead Counsel and Liaison Counsel,
filed April 27, 2006,[1] and defendants Outokumpu Oyj, Outokumpu
Copper Products Oyj, Outokumpu Copper (U.S.A.), Inc., Outokumpu
Copper Franklin, Inc., Outokumpu Heatcraft USA LLC, and Mueller
Industries, Inc.'s Motions for Additional Time Within Which to
Answer or Otherwise Respond, filed May 17 and 24, 2006.  Defendant
Mueller Industries, Inc. ("Mueller") filed a response to
plaintiff's motion on May 3, 2006, in which it indicated that it
does not oppose the motion.  The Outokumpu defendants have not
filed a response in opposition to plaintiff's motion.

On April 28, 2006, U.S. District Judge Bernice Donald referred
plaintiff's motion to the Magistrate Judge for report and
recommendation/determination.  For the reasons below, the court
GRANTS plaintiff's Motion to Consolidate and Coordinate Related

---

[1]On April 27, 2006, plaintiffs United CoolAir Corp.
("CoolAir") and Twinco Supply Corp.'s ("Twinco") filed identical
motions in the cases of <u>United Coolair Corp. v. Outokumpu Oyj, et
al.</u>, 06-CV-2211 Ma/P, and <u>Twinco Supply Corp. v. Outokumpu Oyj,
et al.</u>, 06-CV-2225 B/P.

-2-

Actions, and GRANTS defendants' Motions for an Extension of Time to Answer or Otherwise Respond. The court further RECOMMENDS that plaintiff's Motion to Appoint Plaintiffs' Interim Lead Counsel and Liaison Counsel be GRANTED.

## I.  BACKGROUND

PoolPak is a Pennsylvania corporation and manufacturer of commercial air-conditioning and swimming pool dehumidifying equipment. Compl. ¶ 1. During the course of its business, PoolPak routinely purchases ACR copper tubing, an industrial tubing designed for use in air-conditioning and refrigeration applications. Compl. ¶ 24. The Outokumpu and Mueller Defendants are engaged in the production or sale of ACR copper tubing. Compl. ¶ 9-17. On April 7, 2006, PoolPak filed a class action complaint asserting claims pursuant to Section 1 of the Sherman Act, 15 U.S.C. § 1, against numerous manufacturers and distributors of ACR copper tubing, including these defendants. PoolPak alleges that during the period from May 1988 through December 2003, defendants engaged in a conspiracy to raise, fix, or maintain the price of ACR copper tubing, allegedly causing PoolPak and similarly situated plaintiffs to pay more for such tubing than they would have in a competitive market. Compl. ¶ 2. Plaintiffs Cool Air and Twinco filed substantially similar class action complaints in this district on April 11 and 19, 2006, respectively.

Plaintiff Carrier Corporation ("Carrier") filed a similar

-3-

complaint against these defendants in this district on March 29, 2006 (Carrier Corp. v. Outokumpu, et al., 06 CV 2186 D/V). Although the plaintiff in Carrier does not seek class action status, the plaintiff raises substantially identical allegations and seeks the same relief as the PoolPak, CoolAir, and Twinco plaintiffs.[2]

Plaintiff filed the present motion on April 27, 2006, seeking to consolidate the PoolPak, CoolAir, Twinco class actions (collectively "the class action cases") for all purposes, and to coordinate the class action cases and the Carrier case for purposes of discovery only.  In addition, plaintiffs ask the court to appoint the law firms of Alexander, Hawes & Audet; the Wolf Haldenstein firm; Glassman, Edwards, Wade & Wyatt, P.C.; and Preti, Flaherty, Beliveau & Pachios LLP as Interim Co-Lead Counsel and the Bramlett Law Offices as Interim Liaison Counsel, for the PoolPak, CoolAir and Twinco class action cases.

## II.  ANALYSIS

### A.  Motion to Consolidate

Federal Rule of Civil Procedure 42 authorizes courts to order several cases consolidated when actions involving a common question of fact or law are before the court.  Fed. R. Civ. P. 42(a).  In its discretion, the trial court may order actions consolidated in

---

[2]According to plaintiff's certificate of consultation, Carrier agrees that all related cases should be transferred and consolidated.

-4-

the interests of judicial economy so that it may "administer the
court's business 'with expedition and economy while providing
justice to the parties.'" Williams v. Gilless, No. 93-5844, 1994
U.S. App. LEXIS 4234, at *3 (6th Cir. 1994) (quoting 9 Wright &
Miller, Federal Practice and Procedure, §§ 2381 (1971)). District
courts have broad discretion in determining whether to consolidate
cases, and should consider whether consolidation will promote
judicial economy without impeding justice and the interests of the
parties. Devlin v. Transportation Communs. Int'l Union, 175 F.3d
121, 130 (2d Cir. 1999); Johnson v. Celotex Corp., 899 F.2d 1281,
1285 (2d Cir. 1990).

    The court concludes that the present class action cases are
well-suited for consolidation. The complaints filed by the
PoolPak, CoolAir, and Twinco plaintiffs are nearly identical. The
class actions involve common questions of law and fact, as each
complaint contains the same factual allegations against the same
defendants, seeks the same relief and relies upon the same legal
authority in support of the claims.[3]    Consolidating and

---

[3]Unlike the PoolPak, CoolAir and Twinco plaintiffs, Carrier
does not seek class action status. This factor, however, does
not preclude the use of consolidation for purposes of discovery.
"[A]lthough consolidation is permitted as a matter of convenience
and economy in administration, [it] does not merge the suits into
a single cause, or change the rights of the parties, or make
those who are parties in one suit parties in another." Lewis v.
ACB Bus. Servs., 135 F.3d 389, 412 (6th Cir. 1998) (internal
citations omitted). Carrier's complaint raises questions of fact
and law common to those raised by the class action plaintiffs,
and seeks the same relief that PoolPak, CoolAir and Twinco seek.

coordinating these cases will promote judicial economy.  Thus, PoolPak's motion to consolidate the class action cases for all purposes, and to coordinate these class action cases with the Carrier case for purposes of discovery only, is GRANTED.

## B.  Defendants' Motions for an Extension of Time to Answer or Otherwise Respond

For good cause shown, and no opposition thereto, the defendants' Motions for an Extension of Time to Answer or Otherwise Respond to the complaint is GRANTED.

### III.  REPORT AND RECOMMENDATION

In their motions to consolidate, plaintiffs also ask the court to appoint the law firms of Alexander, Hawes & Audet, the Wolf Haldenstein firm, Glassman, Edwards, Wade & Wyatt, P.C., and Preti, Flaherty, Beliveau & Pachios LLP as Interim Co-Lead Counsel and the Bramlett Law Offices as Interim Liaison Counsel.  In support of their request, plaintiffs have submitted affidavits signed by lead counsel from each law firm and resumes describing each firm's experience with class action or antitrust litigation.  Pl.'s Ex. 1, 3, 5, 6, 7.

### 1.  Proposed Findings of Fact

#### a.  Wolf Haldenstein

Wolf Haldenstein is a New York-based law firm that has extensive experience in class action litigation and prosecuting

---

Thus, consolidation with these cases for purposes of discovery only is appropriate.

similar claims on behalf of class members. The firm has served as class counsel in several recent federal court cases and has recently been appointed interim co-lead counsel in a similar case in this district, In re: Copper Tubing Litigation, No. 04-2771 (W.D. Tenn. filed Sept. 24, 2004). Pl. Ex. 1. In addition, Wolf Haldenstein has significant experience in handling complex antitrust litigation, as it has represented various plaintiffs in over 35 antitrust class action cases. Feit Aff. ¶ 3. Mary Jane Edelstein Feit, who manages Wolf Haldenstein's antitrust practice group and is primarily responsible for this case on behalf of her firm, has over 25 years of experience in antitrust class action cases. Feit Aff. ¶ 4.

### b. Alexander, Hawes & Audet

Alexander, Hawes & Audet is a California-based firm that specializes in the class action prosecution of tort, business fraud, and antitrust claims. Pl.'s Ex. 3. The firm has served as plaintiff's counsel in 11 antitrust class action claims, and has been involved with over 50 other class action lawsuits throughout the country. Id. Alexander, Hawes & Audet has significant experience serving as lead counsel in class actions, and was also recently appointed interim co-lead counsel by this court in In re: Copper Tubing Litigation. William Audet heads the firm's class action practice and will be personally involved in its representation in this case. Audet Aff. ¶ 6.

-7-

### c.    Glassman Edwards

Glassman Edwards is a Tennessee firm with a significant class action practice.  B.J. Wade, the attorney for Glassman Edwards who is primarily responsible for the firm's representation in this case, has served as lead counsel in at least 5 class action cases prosecuted in Tennessee and was recently appointed co-liason counsel by this court in In re: Copper Tubing Litigation and In re: Accredo Securities Litigation, No. 03-2216 (W.D. Tenn. filed April 8, 2003).  Wade Aff. ¶ 4, 6.  In addition, Wade has served on the steering committee in a nationwide class action filed in Santa Clara, California.  Wade Aff. ¶ 4.

### d.    Preti, Flaherty, Beliveau, and Pachios

Preti, Flaherty, Beliveau and Pachios ("Preti Flaherty") is a New England-based law firm with significant antitrust class action experience.  The firm has represented plaintiffs and defendants in at least 18 antitrust class action cases filed in state and federal courts throughout the country.  Pl.'s Ex. 6.  Greg Hansel, the Preti Flaherty attorney responsible for prosecuting this case, is the co-head of the firm's antitrust class action practice, and has experience serving as lead counsel in class action prosecutions and arguing before the Judicial Panel on Multidistrict Litigation. Id.; Hansel Aff. ¶ 4.

### e.    Bramlett Law Offices

Paul Bramlett is licensed in Tennessee and Mississippi and has

-8-

practiced law for over 35 years.  Pl.'s Ex. 7.  His practice is devoted to civil litigation and specializes on securities class actions, consumer class actions, and antitrust litigation.  Id. Bramlett has served as local or liaison counsel in at least nine recent class actions filed in Tennessee, including In re: Copper Tubing Litigation.  Id.

### 2.   Proposed Conclusions of Law

Federal Rule of Civil Procedure 23 authorizes the court to "designate interim counsel to act on behalf of the putative class before determining whether to certify the action as a class action."  Fed. R. Civ. P. 23(g)(2)(A); see also Hill v. Tribune Co., No. 05-2602, 2005 U.S. Dist. LEXIS 23931, at *14-15 (N.D. Ill. Oct. 13, 2005) (unpublished) ("Rule 23(g) provides criteria to consider when appointing class counsel.  No distinction is made regarding appointing interim counsel.").  Rule 23 provides the following factors that the court should consider when appointing class counsel: "the work counsel has done in identifying or investigating potential claims in the action; counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action; counsel's knowledge of the applicable law; and the resources counsel will commit to representing the class."  Fed. R. Civ. P. 23(g)(1)(C).

As discussed above, all of these firms have significant experience in managing complex class action litigation.  Wolf

Haldenstein, Preti Flaherty, and Alexander, Hawes & Audet have each demonstrated that they possess the resources and expertise to prosecute complicated antitrust class action claims, and have held leadership positions in complex cases that involved allegations similar to those at issue in these present cases. Glassman Edwards also has significant experience in managing complex cases, and as a Memphis-based law firm, is familiar with the local rules of this court. Moreover, each firm seeking appointment as interim co-lead counsel has submitted an affidavit describing the work that they have done in these cases. It appears that each of these firms has expended considerable time and resources in pursuing the class action claims. The attorneys have performed market and economic research on the plaintiffs' antitrust claims, have retained experts, and have consulted with people knowledgeable about the copper tubing industry. Feit Aff. ¶ 5; Audet Aff. ¶ 7; Hansel Aff. ¶ 5; Wade Aff. ¶ 6.

Paul Bramlett is licensed in Tennessee and has extensive experience litigating in Tennessee courts, and he is familiar with Tennessee law and the local rules of this court. Moreover, Bramlett has often served as liaison counsel in the Western District; he is currently acting in that capacity in In re: Copper Tubing Litigation.

Based on these facts, the court RECOMMENDS that plaintiff's motion to appoint plaintiffs' interim lead counsel and liaison

-10-

counsel be GRANTED.

### IV.  CONCLUSION

For the reasons above, plaintiff's motion to consolidate and coordinate related actions for purposes of discovery is GRANTED. Defendants' Motions for an Extension of Time to Answer or Otherwise Respond is GRANTED.  The court hereby ORDERS as follows:

1.    The following actions are hereby consolidated before this court for all purposes, including pretrial proceedings, trial and appeal, pursuant to Rule 42 of the Federal Rules of Civil Procedure:

| Abbreviated Case Name | Case Number | Date Filed |
|---|---|---|
| *Poolpak Technologies Corp., v. Outokumpu Oyj, et al.,* | 06-cv-2207 | 04/07/06 |
| *United Coolair Corp., v. Outokumpu Oyj, et al.,* | 06-cv-2211 | 04/11/06 |
| *Twinco Supply Corporation v. Outokumpu Oyj, et al.* | 06-cv-2225 | 04/19/06 |

2.    The caption of these consolidated actions shall be "*In re ACR Copper Tubing Litigation*" and the files of these consolidated actions shall be maintained in one file under Master File No. 06-2207.  Any other class actions now pending or later filed which arise out of or are related to the same facts as alleged in the above-identified cases shall be consolidated for all purposes, if and when they are brought to the Court's attention.

3.    Every pleading filed in the consolidated actions, or in

-11-

any separate action included herein, shall bear the following
caption:

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

|  |  |
|---|---|
| In re ACR COPPER TUBING LITIGATION | ) ) ) ) Master File No.  06-cv-2207-D/P |
| This Document Relates To: | ) ) ) ) |

4.   When a pleading is intended to be applicable to all
actions governed by this Order, the words "All Actions" shall
appear immediately after the words "This Document Relates To:" in
the caption set out above.  When a pleading is intended to be
applicable to only some, but not all, of the consolidated actions,
this Court's docket number for each individual action to which the
pleading is intended to be applicable and the last name of the
first-named plaintiff in said action shall appear immediately after
the words "This Document Relates To:" in the caption described
above (e.g., "_____ (_____)").

5.   Plaintiffs, through Lead Counsel appointed by Order of
this Court, shall file and serve a single consolidated complaint
within 30 days after the entry of this Order.  The consolidated
complaint shall be deemed the original complaint, superseding all
complaints filed in any of the actions consolidated hereunder or in
any related cases.  Defendants shall have 60 days to answer or
otherwise respond to the consolidated complaint. Should Defendants
file a motion challenging the pleadings, the parties shall meet and
confer regarding a mutually acceptable briefing and hearing

-12-

schedule for the motion.

6.    The action styled <u>Carrier Corp, et al. v. Outokumpu Oyj,</u> <u>et al.</u>, Case No. 06-cv-2186, and any subsequently filed related individual action, will be coordinated with *In Re ACR Copper Tubing Litigation* for the purpose of pretrial discovery only.

The court further RECOMMENDS that the law firms of Wolf Haldenstein, Adler, Freeman and Hertz, LLP, Alexander, Hawes & Audet, LLP, Glassman, Edwards, Wade & Wyatt, P.C. and Preti, Flaherty, Beliveau & Pachios LLP be appointed as Interim Co-Lead Counsel and the Bramlett Law Offices be appointed as Interim Liaison Counsel.

Respectfully Submitted,

S/ Tu M. Pham

_____
TU M. PHAM
United States Magistrate Judge

May 24, 2006

_____
Date

**NOTICE**

**WITH REGARDS TO THE REPORT AND RECOMMENDATION ON PLAINTIFF'S MOTION TO APPOINT COUNSEL, ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED WITHIN TEN (10) DAYS AFTER BEING SERVED WITH A COPY OF THE REPORT.   28 U.S.C. § 636(b)(1)(C).   FAILURE TO FILE THEM WITHIN TEN (10) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND ANY FURTHER APPEAL.**

# EXHIBIT C



JUDGE KOELTL

'08 CIV 5751

Peter Jakab (PJ-8553)
FEIN & JAKAB
THE WOOLWORTH BUILDING
233 Broadway • Suite 930
New York, NY 10279
212 732 9290 Ph
212 227 6479 Fx

*Attorneys for Defendants*
GLASSMAN, EDWARDS, WADE & WYATT, P.C.
and AUDET & PARTNERS, LLP

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

WOLF HALDENSTEIN ADLER FREEMAN & HERZ,
LLP; KAPLAN FOX KILSHEIMER LLP; PRETI
FLAHERTY BELIVEAU & PACHIOS LLP; and
BRAMLETT LAW OFFICES,

Plaintiffs,

- against -

GLASSMAN, EDWARDS, WADE WYATT, P.C. AND
AUDET & PARTNERS LLP,

Defendants.

---

**ECF CASE**

Case No.:

**NOTICE OF REMOVAL**

---

    1. Defendants Glassman, Edwards, Wade Wyatt, P.C. and Audet & Partners LLP by

their undersigned attorneys, Fein & Jakab, respectfully submit this Notice of Removal of the

above-captioned action from the Supreme Court of the State of New York, County of New York,

where the action is now pending, as provided by 28 U.S.C. §§ 1441 and 1446.

    2. On or about May 28, 2008, a "Notice" issued in the removed state action was

received by defendant Glassman.[1]  This Notice of Removal is timely filed under 28 U.S.C.

Section 1446(b).

---

[1] The "service" of the summons was defective in a number of respects and the Glassman Firm and Audet
Firm reserve the right to challenge services of process and personal jurisdiction in New York.

3. This is simply a fee dispute between attorneys who were plaintiffs' co-counsel and court-appointed interim class counsel in complex litigation pending for over two years in the United States District Court for Western District of Tennessee entitled *In re ACR Copper Tubing Litigation*, Case No. 06-CV-2207 before United State District Judge Bernice B. Donald (the "ACR Litigation").

4. As more fully set forth below, this Court has jurisdiction under 28 U.S.C. §§ 1331, 1332 and 1367 by reason of the diversity of citizenship of the parties, and by reason that the claims are ancillary to the ACR Litigation in the United States District Court for Western District of Tennessee, to which court this action should be transferred.

5. The amount in controversy exceeds seventy-five thousand dollars ($75,000.00), exclusive of costs and interest.

6. At all times material hereto, Defendants Glassman, Edwards, Wade & Wyatt, P.C. ("Glassman Firm"), and Audet & Partners, LLP ("Audet Firm"), were, and now are, respectively, a professional corporation incorporated in and under the laws of the State of Tennessee and a limited liability partnership organized under the laws of the State of California. Glassman has its principal place of business in Tennessee. Audet has its principal place of business in California.

7. All defendants consent to this removal.

8. At all times material hereto, on information and belief, Plaintiffs Wolf Haldenstein Adler Freeman & Herz. LLP ("Wolf Firm") and Kaplan Fox Kilsheimer LLP ("Kaplan Firm") are and were New York limited liability partnerships with principal offices in New York and Preti Flaherty Beliveau & Pachios LLP ("Preti Firm") is and was a Maine limited liability

2

partnership with principal offices in Maine. Complaint ("Compl.") ¶¶ 1-3 (copy attached hereto as Exhibit A).[2]

9.  On information and belief, at all times material hereto, Bramlett Law Offices ("Bramlett") is and was a law office in Nashville Tennessee. Compl. ¶ 4. As more specifically addressed below, Bramlett alleges no claim in this action and was joined as a party plaintiff fraudulently and solely for the purpose of defeating complete diversity of citizenship as part of a forum shopping effort by Plaintiffs to avoid having this matter adjudicated by the same court that has presided over it for the past two years—Judge Bernice B. Donald of the United States District Court for the Western District of Tennessee.

10.  The parties to this action, with the exception of Bramlett, were co-counsel for plaintiffs, and appointed as interim class counsel, in the ACR Litigation, a complex antitrust class action claim pending in the United States District Court for the Western District of Tennessee. Compl. ¶ 12.

11.  Following the issuance of certain rulings by the district court in the ACR Litigation, the parties hereto (with the exception of Bramlett), as counsel for the ACR Litigation plaintiffs, filed an appeal, and/or participated in appellate proceedings, in the United States Court of Appeals for the Sixth Circuit. Compl. ¶ 14.

12.  During the pendency of the ACR Litigation appeal, Plaintiffs herein, with the exception of Bramlett, purported to make settlement agreements with the defendants in the ACR Litigation on behalf of certain specified named ACR Litigation plaintiffs. Compl. ¶ 15.

13.  Upon information and belief, Plaintiffs herein, with the exception of Bramlett, used those settlement agreements to purport to eliminate Defendants' entitlement to any attorney's

---

[2] It has come to Defendants' attention that the ACR Litigation defendants have taken the position that the settlement sum in the ACR Litigation is confidential. Because Defendants here have not signed, nor even been provided with copies of, the alleged ACR settlement agreements, Defendants here are neither aware of, nor bound by, the alleged settlements' terms. Nonetheless, in order to accommodate the ACR Defendants' stated position, the removed Complaint and Summons are redacted to remove specific reference to the settlement agreements' alleged terms.

fees or expenses from the ACR Litigation settlement, despite Defendants' status as attorneys of record and Defendants' appointment by Judge Donald of the United States District Court for the Western District of Tennessee as interim class counsel.

14. In order to protect their right to recover their attorney's fees and expense reimbursements, Defendants filed liens in the Sixth Circuit and the Western District of Tennessee, the courts in which the ACR Litigation has been pending. Compl. ¶ 20. Copies of Plaintiff's liens in the Sixth Circuit Court of Appeals and in the Western District of Tennessee are attached hereto as Exhibit B. Those liens remain pending today.

15. Instead of adjudicating this fee dispute and its liens in the ACR Litigation where they arose and are pending, Plaintiffs engaged in some transparent forum shopping and filed this action in the New York state court, a forum with no connection to the ACR Litigation, but simply being the location the Wolf Firm's and the Kaplan Firm's home offices.

16. It is well-settled that the court in which a principal action is or was pending has jurisdiction over any fee disputes that arise between or among counsel and/or their clients in connection with such action. E.g., Baer v. First Options of Chicago, Inc., 72 F.3d 1294, 1297-1301 (7th Cir. 1995) (citing numerous cases); Grimes v. Chrysler Motors Corp., 565 F.2d 841, 844 (2d Cir. 1977); 28 U.S.C. § 1367.

17. That is why Defendants have already filed proceedings to enforce their liens in the ACR Litigation and to resolve the fee dispute (the "Fee Proceedings"). The Fee Proceedings consist of: (a) an action filed as a related case to the ACR Litigation, and so accepted by the United States District Court for the Western District of Tennessee (the "Action"), and (b) a motion within the ACR Litigation (the "Motion"). Copies of the Action and the Motion, together with its Memorandum of Law, are attached hereto as Exhibit C.

18. The Fee Proceedings have been assigned to, and are pending before, Judge Donald, who presided over the ACR Litigation. Ex. C.

4

19. Plaintiffs in this action (with the exception of Bramlett, which is not a party to the Fee Proceedings) have filed motion practice in, and are actively litigating, the Fee Proceedings. Plaintiffs' opposition and motion to dismiss in the Fee Proceedings are attached hereto as Exhibit D.

20. Accordingly, this action should be transferred to the Western District of Tennessee, where (a) the ACR Litigation took place, (b) where the attorneys fee liens are filed and where the Fee Proceedings are already pending and being litigated, so that this fee dispute can be presented to Judge Donald and resolved pursuant to that Court's ancillary jurisdiction in connection with the ACR Litigation.

21. Following assignment of this action to a district judge of this Court and service of this Notice of Removal upon the Plaintiffs, Defendants will move promptly for transfer to the United State District Court for the Western District of Tennessee.

22. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. Section 1331, 1332 and 1367 because the fee dispute is ancillary to the ACR Litigation before Judge Donald and by virtue of complete diversity between Plaintiffs the Wolf Firm (New York), the Kaplan Firm (New York) and the Preti Firm (Maine), on the one side and Defendants the Glassman Firm (Tennessee) and the Audet Firm (California).

23. Plaintiffs here have sought to defeat diversity jurisdiction by joining as a party plaintiff the Bramlett firm.  The joinder of the Bramlett firm is fraudulent in that it is done solely for the purpose of defeating diversity.  The Bramlett firm:

> a.  Is not alleged to have been counsel for any ACR Plaintiffs; (Compl. ¶ 10
> (limiting definition of "Counsel for the ACR Plaintiffs" to the Wolf Firm, the
> Kaplan Firm and the Preti Firm))
>
> b.  Is not alleged to have negotiated an alleged settlement or fee agreement;
> (Compl. ¶ 15 (only "Counsel to the ACR Plaintiffs" are alleged to have done so))

5

     c. Is not alleged to have been prevented from receiving a "Fee Portion" of the alleged settlement pursuant to the settlement and fee agreements; (Compl. ¶¶ 21, 22, 25 (only "Counsel to the ACR Plaintiffs" are alleged to have been so prevented))

     d. Has no claim in this action because each of the three alleged causes of action—tortious interference with the settlement agreements, tortious interference with the fee agreements and declaratory judgment based on the alleged settlement and fee agreements—is based on alleged agreements to which the Bramlett firm is not alleged to be a party.

24. The Court is empowered to disregard the citizenship of parties joined fraudulently in that their only purpose in the action is to destroy diversity of citizenship to avoid federal jurisdiction. E.g., In Re Rezulin Prods Liab. Litig., 133 F. Supp. 2d 272, 280 (S.D.N.Y. 2001). In order to avoid a ruling of fraudulent joinder to defeat diversity, there must be a reasonable possibility of a claim involving the non-diverse party. Id.

25. Here, by a plain reading of Plaintiffs' own allegations, the only non-diverse party, Bramlett, has no claim whatsoever and has asserted none. Although its name appears in the caption, it is entirely absent from any and all of the charging allegations. Accordingly, Bramlett's presence in the removed action must be disregarded for purposes of diversity of citizenship.

26. A copy of all process and pleadings received by the Defendants as of the filing of this Notice of Removal is attached to this Notice as Exhibit A.

27. Defendants will give written notice of the filing of this Notice as required by 28 U.S.C. § 1446(d).

6

28. A copy of this Notice of Removal will be filed with the clerk of the Supreme Court of the State of New York, County of New York, as required by 28 U.S.C. § 1446(d).

Dated:  New York, New York
       June **25**, 2008

Respectfully,

FEIN & JAKAB
THE WOOLWORTH BUILDING
233 Broadway • Suite 930
New York, NY 10279
(212) 732-9290

By: _____
        PETER JAKAB (PJ-8553)

*Attorneys for Defendants*
GLASSMAN, EDWARDS, WADE &
WYATT, P.C. and AUDET & PARTNERS,
LLP

7